IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | No. CR13-2035 |
| vs. | REPORT AND RECOMMENDATION |
| GEOFFREY SCOTT GAFFNEY, | |
| Defendant. | |

TABLE OF CONTENTS

*I.*   *INTRODUCTION* .................................... 1

*II.*  *PROCEDURAL HISTORY* ............................. 2

*III.* *RELEVANT FACTS* .................................. 2

*IV.*  *DISCUSSION* ....................................... 6
       *A.*   *Was the Vehicle Stop Lawful?* ............... 7
       *B.*   *Was the Vehicle Stop Unduly Prolonged?* ..... 12
       *C.*   *Was the Pat-down Lawful?* ................... 14

*V.*   *SUMMARY* ......................................... 18

*VI.*  *RECOMMENDATION* ................................. 18

*I. INTRODUCTION*

On the 3rd day of January 2014, this matter came on for hearing on the Motion to Suppress (docket number 21) filed by the Defendant on December 19, 2013. The Government was represented by Assistant United States Attorney Dan Chatham and

Special Assistant United States Attorney Ravi Narayan. Defendant Geoffrey Scott Gaffney appeared in person and was represented by his attorney, Jill M. Johnston.

## II. PROCEDURAL HISTORY

On November 5, 2013, Defendant Geoffrey Scott Gaffney was charged by Indictment with possession with the intent to distribute methamphetamine. At the arraignment on November 21, Defendant entered a plea of not guilty and trial was set for January 21, 2014.

On December 19, 2013, Defendant timely filed the instant motion to suppress. The Government filed its resistance on December 30. Because of the pending motion, the trial was continued to February 24, 2014.

## III. RELEVANT FACTS

On August 21, 2013, Officer Albert Bovy of the Waterloo, Iowa, Police Department was on routine patrol. At approximately 12:24 a.m., while sitting at a stop light facing west on Franklin Street in Waterloo, Bovy observed a car approaching him from the opposite direction. Bovy believed that the car was traveling at "a high rate of speed," and estimated its speed at the hearing at 50 to 55 miles per hour. The speed limit on Franklin Street is 35 miles per hour.

Officer Bovy waited at the intersection as the light changed and the subject vehicle passed going the opposite direction. Bovy immediately made a u-turn and followed the subject vehicle. Before Bovy activated his lights or siren, the subject vehicle "braked hard" and turned right at the next intersection onto Rhey Street and stopped immediately. A video recording of the events (Defendant's Exhibit A) shows that Bovy turned on his emergency lights just as the subject vehicle was turning right. Bovy testified, however, that he could see the other vehicle was pulling over to the side of the street when he

2

activated his emergency lights.[1] That is, the subject vehicle was "pulling over" even before Bovy turned on his top lights. The video recording reflects the subject vehicle was stopped at 12:25:06. Defendant was the driver and sole occupant of the vehicle.

After the vehicle was stopped, Officer Bovy immediately approached the vehicle on the driver's side. According to Bovy, he generally prefers to "call in" the license plate and his location before approaching the vehicle, but in this case he noticed movements by the driver and wanted to make sure he wasn't obtaining a weapon. Bovy told Defendant that he stopped him for speeding and estimated his speed at 50 to 55 miles per hour. Defendant replied that he "thought I was only going in the 40s."[2] At Bovy's request, Defendant produced his driver's license and insurance card, although Bovy determined that the insurance card was expired. While Defendant was searching for a valid insurance card, Bovy went to the back of the vehicle and called in to dispatch the license plate, Defendant's name, and date of birth. According to Bovy, dispatch responded within a short period of time, advising that Defendant's driver's license was valid, that he had no active warrants for his arrest, and that he had a "previous narcotics history."

---

[1] The location of the vehicle in relation to the intersection of Franklin and Rhey can be seen in photographs taken by an investigator with the Federal Defender's Office on December 23, 2013. *See* Defendant's Exhibits H, I, and J. The investigator determined the position of the vehicle by comparing it to a light pole and house shown in the video recording of the incident. The investigator explained, however, that her vehicle was not parked as close to the curb because of snow at the location in December which, quite obviously, was not present in August.

[2] The description of the conversation between Officer Bovy and Defendant is based on Bovy's testimony at the hearing. While there is a video recording of the vehicle stop, there is no audio recording because Bovy's "body mic" had been inadvertently switched off. Apparently, there is an on/off switch on the bottom of the device — which Bovy wore on his belt – and Bovy opined that because he had gained some weight, the switch must have been turned off by rubbing against his pants. According to Bovy, he generally checks to make sure his microphone is working as he approaches a vehicle, but in this case he was hurried because of Defendant's movements inside the vehicle.

When Officer Bovy reapproached the driver's window, he could tell Defendant was "getting more nervous." According to Bovy, Defendant had "beads of sweat forming on his forehead," his voice was shaky, his hands were shaking as he "fumbled" for his insurance papers, and he was breathing heavily. Bovy testified that the longer he dealt with Defendant, the more nervous Defendant became. Bovy opined that the nervousness exhibited by Defendant was beyond that normally observed in a traffic stop.

Eventually, Defendant produced valid insurance information. As he was examining the document, Officer Bovy was advised by Officer Gann on "channel 4" that Defendant was still involved in illegal narcotics activity. Bovy testified that Gann, who is assigned to the violent crimes unit, was working that night and heard Bovy call in Defendant's name. According to Bovy, it is not uncommon for officers to provide "pertinent information" on a secure channel for the benefit of the officer conducting the stop.

Early on, Officer Bovy asked Defendant where he was going and he responded "to a friend's house." Later, Bovy asked Defendant again where he was going and Defendant said he was going to a convenience store to purchase sandwich meat. Defendant told Bovy that he had stopped at a different convenience store first, but it did not have what he wanted. When Bovy questioned Defendant regarding the inconsistency in his responses, Defendant did not respond. Bovy asked if there were any drugs in the car and Defendant looked down and said "no." Bovy then asked if there were any weapons in the car. Defendant looked at Bovy and said "no." At that point, Bovy asked for consent to search Defendant's vehicle. Defendant declined, stating that his probation officer had told him never to let the police search his vehicle, because "that's how he had gone to prison before."

Officer Bovy, who has been a canine officer since 2007, then told Defendant that he intended to get out his dog to conduct a sniff of the vehicle. Bovy asked Defendant to

step out of the car, and he complied. Defendant got out of the vehicle at 12:30:05, or precisely five minutes after the initial stop.

Rather than proceed directly to the back of the vehicle, Defendant appeared to drift a few feet toward the center of the street. Officer Bovy then placed his hand on Defendant's back, grabbing his t-shirt, and directed him to the area in front of Bovy's squad car. Bovy opined that Defendant seemed "almost in a daze," and recalls that Defendant's shirt was wet from sweat.[3] Officer Watson, who had arrived on the scene a couple of minutes earlier, directed Defendant to an area near the curb, just outside of view from Bovy's vehicle camera.

At that point, Officer Bovy patted Defendant down for weapons. According to Bovy, the location was a high crime area, with high drug traffic, numerous shootings, and a homicide two blocks away a couple of months earlier. Bovy testified that he patted Defendant down for "officer safety."

In conducting the pat-down, Officer Bovy started in the "pliers pocket" located on the side of Defendant's blue jeans.[4] According to Bovy, he generally starts with the pliers pocket because it is often used as a location to hold a knife. Bovy immediately detected a long round object which at first he thought might be a large pocketknife. But as he got to the bottom, he felt a bulb on the end. Bovy testified that on every occasion when he has felt a similar object — which he estimated to be 50 times — it was either a meth pipe or crack pipe. Bovy asked Defendant what was in his pocket and Defendant replied that there was nothing in his pocket. Bovy told Defendant that there was definitely something in there and it felt exactly like a meth pipe. Defendant responded that "it's not mine." Bovy

---

[3] According to the investigator for the Federal Defender's office, archived records reflect the temperature was approximately 73 degrees.

[4] The blue jeans being warn by Defendant that night were retrieved by his attorney from the Linn County Jail and displayed at the hearing. They were not, however, introduced as an exhibit.

then asked Defendant "are these your pants?" and Defendant responded "yes." Bovy asked what it was, and Defendant responded "I didn't put it in there." Bovy then placed Defendant in handcuffs and removed a meth pipe from his pocket. Officer Watson placed the meth pipe in an evidence bag and secured it in his car.

Officer Bovy then *Mirandized* Defendant and searched his pockets, finding a large sum of cash and a knife. Bovy asked Defendant if the meth pipe would have his fingerprints on it, and Defendant admitted that his fingerprints would be found on the pipe. Bovy asked whether Defendant had an "issue" with methamphetamine, and Defendant told him that he had been doing well for a long time, but started using again about two months ago.

Because Defendant had been arrested and the vehicle would be towed, Officer Watson initiated an inventory search of the vehicle. A small amount of marijuana was found in a magnetic key holder in the passenger compartment. However, a search of the trunk revealed two large Ziploc bags containing approximately four pounds of ice methamphetamine. Additional facts as they pertain to the conclusions of law will be set forth below.

## IV. DISCUSSION

In his motion to suppress, Defendant asks the Court to suppress any evidence and statements obtained as a result of the stop and search of his person and vehicle on August 21, 2013.[5] In support of his motion, Defendant raises three arguments: First, Defendant asserts that Officer Bovy lacked probable cause or reasonable suspicion to stop Defendant's

---

[5] Defendant also asks the Court to suppress any evidence obtained pursuant to two search warrants issued as a result of the stop and search of his person and vehicle. The parties agree that the validity of the search warrants will rise or fall based on the validity of the traffic stop. That is, Defendant concedes that if there was no constitutional violation at the scene, then the subsequent search warrants are valid. Conversely, the Government agrees that if the stop and search at the scene were violative of the Constitution, then the search warrants must also fail.

vehicle. Second, Defendant argues that even if the vehicle stop was lawful, it was unduly prolonged and exceeded the permissible scope of a *Terry* stop. Third, Defendant claims that the pat-down of his person was constitutionally invalid.

### A. *Was the Vehicle Stop Lawful?*

Defendant first argues that the stop of his vehicle was without probable cause or a reasonable suspicion of criminal activity being afoot. The Fourth Amendment protects against unreasonable searches and seizures. A traffic stop constitutes a seizure of the vehicle's occupant. *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012). Accordingly, a traffic stop "must be supported by reasonable suspicion or probable cause." *Id.* at 706. Any traffic violation, however minor, provides probable cause for a traffic stop. *Id.* Accordingly, if a police officer has an objectively reasonable basis to believe that a driver is speeding, then there is probable cause to conduct a traffic stop, notwithstanding the officer's subjective intentions. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007).

> A pretextual traffic stop violates the Fourth Amendment. It is well established, however, that any traffic violation, no matter how minor, provides a police officer with probable cause to stop the driver of the vehicle. To determine whether a stop was based on probable cause or was merely pretextual, we apply a "standard of 'objective reasonableness.'" So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop.

*United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (internal citations omitted).

Here, Defendant argues that there was no objectively reasonable basis for Officer Bovy to believe Defendant was speeding. In support of his argument, Defendant offered the testimony of Tina Debban, an investigator with the Federal Defender's Office. Debban

has worked as an investigator with the Federal Defender's Office for more than 9 years, and prior to that was employed as a police officer for 18 years. Debban traveled to Waterloo on December 23, 2013, and took photographs of the scene. *See* Exhibits E-K. Both Officer Bovy and Debban testified — and the photographs confirm — that Franklin Street declines in elevation some distance west of the intersection where Bovy was sitting when he observed Defendant coming toward him. Debban "guesstimated" (her word) the spot where a vehicle traveling east on Franklin Street would be visible by someone sitting in Bovy's position at the intersection. Debban then measured that distance using a measuring wheel, and determined it to be 473 feet.

The video recording from Officer Bovy's car shows Defendant's headlights first coming into view towards Bovy, and then crossing his position nine seconds later. That is, if Investigator Debban's estimate is accurate regarding where the vehicle could first be seen, then Defendant traveled 473 feet in approximately nine seconds, or about 52.6 feet per second. By the Court's calculation, 52.6 feet per second is equivalent to approximately 35.8 miles per hour.[6] Obviously, this calculation is not determinative of how fast Defendant was going at any particular spot, and is dependent on the accuracy of the distance when he could first be seen (473 feet) and the time it took to traverse that distance (9 seconds). For example, if Debban was off by 50 feet in estimating the spot where Defendant's vehicle could first be seen, then his speed may be estimated at 39.6 miles per hour. Moreover, as noted by the Government, these figures represent Defendant's *average* speed over the distance from where he could first be seen to the point where he passed Bovy after crossing through the intersection. If Defendant observed Bovy's marked police car as he approached the intersection, then it may have caused him to slow down.

---

[6] Feet per second may be converted to miles per hour by multiplying times 3,600 (the number of seconds in an hour) and dividing by 5,280 (the number of feet in a mile).

The Court has looked, without success, for an Eighth Circuit case discussing the question of whether an officer's visual estimate of speed — uncorroborated by radar or pacing — is sufficient to establish probable cause to initiate a traffic stop. The Fourth Circuit addressed the issue at some length, however, in *United States v. Sowards*, 690 F.3d 583 (4th Cir. 2012). In that case, a deputy sheriff visually estimated that the defendant's vehicle was traveling 75 miles per hour in a 70 mile-per-hour zone along a North Carolina interstate highway. While the deputy's patrol car was equipped with radar, he had intentionally positioned his patrol car at an angle that rendered an accurate radar reading impossible. *Id.* at 585. While the deputy was required to visually estimate the speed of 12 vehicles as a condition of obtaining radar certification, the majority in *Sowards* concluded that the deputy's "visual speed estimate was in fact a guess that was merely conclusory, without an appropriate factual foundation, and simply lacking in the necessary *indicia* of reliability to be an objectively reasonable basis for probable cause to initiate a traffic stop."[7] *Id.* at 594. In a 2-1 decision, the *Sowards* Court concluded that for a visual speed estimate to supply probable cause, "there must be sufficient *indicia* of reliability for a court to credit as reasonable an officer's visual estimate of speed." *Id.* at 591. The Court noted, however, that the percentage difference between the estimated speed and the legal speed limit may itself provide sufficient *indicia* of reliability to support an officer's probable cause determination. *Id.*

Six weeks after the *Sowards* decision was handed down, a different panel in the Fourth Circuit addressed the issue and discussed *Sowards* at some length. In *United States v. Mubdi*, 691 F.3d 334 (4th Cir. 2012), two police officers testified that they

---

[7] The deputy testified that he reached his estimate after watching the defendant approach from approximately 100 yards out. On cross-examination, however, the deputy testified that there were 12 feet in a yard and 12 inches on a yardstick, "depend[ing] on the yardstick." *Id.* at 590. When asked by the court how many inches are on a yardstick, the deputy replied "four foot in a yard." *Id.* at 586.

independently determined by visual observation that the defendant was traveling approximately 8 to 10 miles faster than the posted 55 mile-per-hour speed limit. Because of the angle at which they were parked, they were unable to verify their estimates with radar equipment, but each noticed the defendant's car was gaining on the cars in front of it and pulling away from the cars behind it. *Id.* at 337. In rejecting the defendant's argument that there was no probable cause to stop him for speeding, the *Mubdi* Court first noted that the Fourth Circuit had previously intimated in an unpublished opinion that "an officer's visual observation of a driver speeding may alone be sufficient to establish probable cause." *Id.* at 339. It also noted, however, that in the recent *Sowards* case, the Court concluded that "the Fourth Amendment does not allow, and the case law does not support, blanket approval for the proposition that an officer's visual speed estimate, in and of itself, will always suffice as a basis for probable cause to initiate a traffic stop." *Id.* (quoting *Sowards*, 690 F.3d at 591). The Court noted that the majority opinion in *Sowards* emphasized that "the probable cause inquiry is — as always — reasonableness, and the analysis remains whether the 'totality of the circumstances' establishes 'the reasonableness of the officer's visual speed estimate.'" *Id.* (quoting *Sowards*, 690 F.3d at 592-93). The *Mubdi* Court referenced the "vigorous and well-reasoned dissent" in *Sowards* and concluded "[w]e are satisfied that the totality of circumstances present here supports the district court's ruling" that the traffic stop was supported by the officers' reasonable belief that Mubdi was speeding. *Id.*, n.6.

In *United States v. Ludwig*, 641 F.3d 1243 (10th Cir. 2011), a trooper made a visual determination that the defendant was speeding, and verified his estimate using a radar gun. In a motion to suppress, the defendant argued that probable cause was lacking because the radar gun was unreliable as a result of the trooper's allegedly shoddy maintenance habits. The district court rejected the argument, but also found the trooper's visual estimate of the defendant's speed to be credible. The Tenth Circuit Court of

Appeals concluded that the district court's factual finding regarding the reliability of the trooper's visual estimation of speed was "itself sufficient to support the traffic stop." *Id.* at 1248. "It's long been the case that an officer's visual estimation can supply probable cause to support a traffic stop for speeding in appropriate circumstances." *Id.* at 1247.

Turning to the facts in the instant action, Officer Bovy testified that when he first received training to become a police officer in 2002, he was required to make visual estimates of speed. According to Bovy, he did "30 or 50 of those," at various speeds. When asked how often he stopped people based on making a visual estimate of speed, Bovy responded "not very often." According to Bovy, "I don't use speed unless they're going well over the posted speed limit." In this case, Bovy's estimate as to Defendant's speed was based on "the speed it looked as though he was going, from my past experience, my experience of that area, knowing what 35 miles an hour looks like in that area, the distance he traveled."

While it is a close question, the Court concludes that the totality of the circumstances establishes the reasonableness of Officer Bovy's belief that Defendant was speeding as he approached the intersection. *Mubdi*, 691 F.3d at 339; *Sowards*, 690 F.3d at 592-93. Bovy did not know Defendant or Defendant's car prior to the stop, there is no indication Bovy had any information that Defendant may be carrying large amounts of methamphetamine, and there is no evidence that Bovy's estimate of Defendant's speed was a mere pretext for stopping Defendant's vehicle. Bovy testified it was necessary for Defendant to "brake hard" to turn right at the next intersection. The video recording from Bovy's car and the measurements taken by Investigator Debban support a finding that Defendant was speeding, albeit not as fast as Bovy initially estimated. Could Defendant have been convicted of speeding beyond a reasonable doubt based on Bovy's testimony alone? Probably not. But here, the issue is whether the totality of the circumstances establishes *probable cause* to believe Defendant was speeding.

This conclusion is supported by the recent decision in *United States v. Gordon*, ___ F.3d ___ (8th Cir. 2013), 2013 WL 6726850 (decided December 23, 2013). There, an officer looked through his rear-view mirror and observed a white SUV speeding two blocks away. The officer lost sight of the SUV, but alerted a helicopter unit to be on the lookout. The helicopter unit spotted the vehicle and followed it until it was stopped by another officer. In moving to suppress the evidence, the defendant argued that there was insufficient evidence to conclude that the vehicle observed by the first officer was the same vehicle stopped by the second officer. The Eighth Circuit Court of Appeals rejected the defendant's argument, concluding that "the helicopter unit's independent, continued observation of the speeding Expedition is enough alone to justify Officer Lambright's stop of the vehicle." *Id.* at *3. *See also United States v. Colden*, 2011 WL 5039777 (D. Md.) (finding an officer's visual estimation of speed was sufficient to establish probable cause). *But see United States v. Moore*, 2011 WL 6325973 (S.D.N.Y.) (finding an officer's "bare assertion that the car was traveling at a 'high rate of speed'" did not establish probable cause).

### B. Was the Vehicle Stop Unduly Prolonged?

Defendant next argues that the vehicle stop was unduly prolonged and exceeded the permissible scope of a *Terry* stop. *See United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) ("The Supreme Court has analogized roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). A reasonable investigation includes asking for the driver's license and registration, as well as asking questions about the occupant's destination, route, and purpose. *United States v. Suitt*, 469 F.3d 867, 870-71 (8th Cir. 2009). "A lawful traffic stop 'can become unlawful if it is prolonged beyond the

time reasonably required to complete' the mission of the stop." *United States v. Hernandez-Mendoza*, 600 F.3d 971, 975 (8th Cir. 2010) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

Defendant argues that after Officer Bovy determined that Defendant had a valid driver's license and proof of insurance, and that there were no outstanding warrants for his arrest, "the legitimate investigative purposes of the traffic stop were completed."[8] Continued detention of a vehicle's occupants is constitutional, however, if an officer has reasonable suspicion of other criminal activity. *United States v. Gallardo*, 495 F.3d 982, 987 (8th Cir. 2007). *See also United States v. Stringer*, ____ F.3d ____ (8th Cir. 2014), 2014 WL 30668, *2 (decided January 6, 2014) ("We consider the totality of the circumstances to determine, 'based on commonsense judgments and inferences about human behavior,' whether the trooper had 'at least a minimal level of objective justification' for prolonging the seizure.") (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Officer Bovy testified that his suspicions were aroused by Defendant's excessive nervousness and inconsistent answers to questions. According to Bovy, when he returned to the driver's window after calling in the license plate number, Defendant had beads of sweat forming on his forehead, his voice was shaky, his hands were shaking as he fumbled for his insurance papers, and he was breathing heavily. Bovy also testified Defendant had difficulty maintaining eye contact. Bovy opined that the nervousness exhibited by Defendant was well beyond that normally observed in a traffic stop. *Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). Furthermore, Defendant gave Bovy inconsistent answers regarding his purported destination. It is also noteworthy that the vehicle stop occurred in a high crime area. In *Wardlow*, the Court noted that the fact the stop occurred

---

[8] Defendant's Brief (docket number 21-1) at 6.

13

in a high crime area was "among the relevant contextual considerations in a *Terry* analysis." *Id.* Lastly, Bovy had been told that Defendant had a previous narcotics history and may still be involved in illegal narcotics activity. Accordingly, I believe Bovy had a sufficient basis to form a reasonable, articulable suspicion that Defendant may be engaged in criminal activity. *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (a driver's undue nervousness, conflicting answers, and misrepresentation regarding criminal history found sufficient to establish reasonable suspicion).

The Eighth Circuit has repeatedly recognized that "if the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion." *United States v. Peralez*, 526 F.3d 1115, 1120 (8th Cir. 2008). Given his suspicions regarding possible criminal activity, Officer Bovy asked Defendant to step out of his car so Bovy could have his dog conduct an open-air sniff. While a dog sniffing the exterior of a vehicle is not a search under the Fourth Amendment, it may be the product of an unconstitutional seizure if the traffic stop is unreasonably prolonged before the dog is deployed. *Suitt*, 569 F.3d at 870. Here, within five minutes after stopping Defendant, Bovy developed a reasonable suspicion of possible criminal activity while questioning Defendant regarding the circumstances of the stop. Because the vehicle stop was not unduly prolonged, Bovy's decision to run his dog around the car based on reasonable suspicion was not unlawful. *Id.* at 873 ("We have repeatedly upheld dog sniffs that were conducted within a few minutes after a traffic stop ended.").[9]

### C. Was the Pat-down Lawful?

Finally, Defendant argues that the pat-down was conducted by Officer Bovy without a reasonable suspicion that Defendant was armed, and that Bovy impermissibly

---

[9] Officer Bovy's dog was never actually deployed. Before that could be accomplished, Bovy discovered drug paraphernalia on Defendant's person and placed him under arrest. An inventory search of Defendant's vehicle eliminated the need for a dog sniff.

manipulated the object in Defendant's pants to determine it was contraband. The Government asserts that Bovy had a reasonable, articulable suspicion that Defendant was armed, and that the incriminating nature of the meth pipe was immediately apparent to Bovy.

In the landmark case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Court held that where a police officer observes unusual conduct which leads him reasonably to conclude that criminal activity may be afoot, the officer may briefly stop the suspicious person and make "reasonable inquiries" regarding his suspicions. *Id.* at 30. Furthermore, the officer may conduct a pat-down to search for weapons where he has "reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Courts apply an objective test to resolve the question of whether a reasonable, articulable suspicion justified a protective search. *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002).

Here, Officer Bovy determined that Defendant was extremely nervous. Bovy had been advised that Defendant had a previous narcotics history and may still be involved in illegal narcotics activity. Drug trafficking often involves the use of dangerous weapons. These events occurred at 12:30 a.m. in an area known by Bovy to be a high crime area. According to Bovy, this area was known for high drug traffic and numerous shootings, including a recent homicide. The level of suspicion necessary to justify a protective pat-down search "is considerably less than proof of wrongdoing by a preponderance of the evidence" and "is obviously less demanding than that for probable cause." *Roggeman*, 279 F.3d at 578 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Given all of the circumstances, the Court concludes that a "reasonably prudent man" would be warranted in believing that his safety or the safety of others may be in danger. *Terry*, 392

U.S. at 27. Accordingly, Bovy was authorized to conduct a protective pat-down for officer safety.

Defendant also argues that Officer Bovy impermissibly manipulated the object in Defendant's pocket prior to determining its incriminating nature. In *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993), the Court emphasized that a protective pat-down search "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" (quoting *Terry*, 392 U.S. at 26). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* Analogizing to the "plain view doctrine," however, the Court concluded that officers may seize objects whose incriminating nature is readily apparent.

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Dickerson*, 508 U.S. at 375-76. In determining whether the object is contraband, however, the officer cannot conduct a further search by "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket." *Id.* at 378.

Officer Bovy testified that as he slid his hand down the outside of Defendant's pliers pocket, he detected a long round object, with a bulb on the end. Bovy credibly testified that he did not "manipulate" the object in any way prior to determining its incriminating nature. That is, as a factual matter, I find no *Dickerson* violation.

Defendant argues, however, that the incriminating nature of the object was not "immediately apparent." The Eighth Circuit Court of Appeals has noted that in *Texas v.*

*Brown*, 460 U.S. 730 (1983), the Supreme Court suggested that the phrase "immediately apparent" is "very likely an unhappy choice of words."

> The Supreme Court clarified that an item's incriminatory nature is immediately apparent if the officer at that moment had "probable cause to associate the property with criminal activity," meaning "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." It does not require "any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical" probability that incriminating evidence is involved is all that is required."

*United States v. Cowan*, 674 F.3d 947, 953 (8th Cir. 2012) (internal citations omitted).

At the instant hearing, Defendant's counsel placed an object in the pliers pocket of the pants worn by Defendant on the night of this incident, and had Officer Bovy pat down the pocket. Bovy testified that he felt a tube shape with a round ball on the end, similar to a meth pipe. When the object was removed from the pocket it was determined to be fingernail polish, demonstrating that an object with those characteristics *could* be something other than a meth pipe or crack pipe. Bovy testified, however, that in all of his years as a police officer, every time he felt a similar shape in a suspect's pocket — which he estimated to be 50 times — it turned out to be a drug pipe. As indicated in *Cowan* above, all that is required is for a "man of reasonable caution" to believe that the item *may* be contraband. Clearly, Bovy's testimony meets that standard.

I conclude that Officer Bovy was justified in believing Defendant may be armed, thereby authorizing a protective pat-down for officer safety. Without manipulating the object, Bovy reasonably believed that the object in Defendant's pliers pocket was a meth pipe or crack pipe, constituting contraband. Therefore, Bovy was authorized to seize the object.

## V. SUMMARY

In summary, I believe that Officer Bovy had probable cause to stop Defendant's vehicle for speeding. After the stop, Bovy's suspicions were aroused by Defendant's excessive nervousness, inconsistent answers, criminal history, and possible continued drug activity. When Defendant was required to exit the vehicle to facilitate a dog sniff, Bovy was authorized to conduct a protective pat-down for officer safety. The incriminating nature of the object felt in Defendant's pants pocket was readily apparent to Bovy. Accordingly, I find no constitutional violation here.[10]

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 21) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on January 3, 2014.*

DATED this 8th day of January, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[10] Defendant apparently concedes that after Officer Bovy determined he was in possession of drug paraphernalia, Defendant was subject to arrest and an inventory search of his car was authorized.